IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

)
)
)
)
In re:                             )        Case Number: Misc. No. 24-936
Grand Jury Proceedings             )
)
)
)
)

**MEMORANDUM IN SUPPORT OF OBJECTION TO IMMUNITY
ORDER AND MOTION FOR HEARING THEREON
CLAIM OF UNCONSTITUTIONALITY**

Micaiah Collins has objected to the immunity order previously issued in this matter

pursuant to 18 U.S.C. § 6002 and moved for a hearing on same.  In support of her

Objection and Motion, Ms. Collins submits the following memorandum.

I.      **18 U.S.C. § 6002 Violates the Tenth Amendment to the Extent it
Precludes State Prosecutions Based Upon a Federal Grant of
Immunity.1**

There is no doubt that past cases interpreting 18 U.S.C. § 6002 and predecessor

statutes have held that the federal government can grant immunity from state

prosecution.  *See* Scott Clair, <u>Dual Sovereignty and Preventive Commandeering: Why

the Federal Immunity Statute Cannot Preempt State Prosecutions</u>, 2003 U. Ill. L. Rev.

863, 869-70 (2003)2 (citing authorities holding as much between the years 1954 and

1960 beginning with *Adams v. Maryland*, 347 U.S. 179 (1954)).

---

1 Alternatively, 18 U.S.C. 6002 could be construed not to provide witnesses with
protection from state prosecutions, in which case it would not provide a level of
protection co-extensive with the Fifth Amendment.

2 This article is attached as <u>Exhibit A</u> to the instant memorandum, and the arguments

However, as a result of the Court's decision in *Printz v. United States*, 521 U.S. 898 (1997), and related jurisprudence, the constitutionality of 18 U.S.C. § 6002 "has been placed in doubt."  Scott Clair, <u>Dual Sovereignty and Preventive Commandeering: Why the Federal Immunity Statute Cannot Preempt State Prosecutions</u>, 2003 U. Ill. L. Rev. at 863-64.  As explained in detail throughout this article, "*Printz* has revitalized the pre-*Adams* view that dual sovereignty prohibits the federal immunity statute from preempting a subsequent state prosecution."  *Id.* at 865.3

18 U.S.C. § 6002 is "a form of preventive commandeering: it preempts the states in certain situations from carrying out one of their legitimate functions to further a federal objective."  *Id.* at 864.  In other words, when the federal government invokes the federal immunity statute and thereby precludes states' enforcement of state law:

> This is just another form of commandeering.  Instead of compelling the states to enforce federal law, the federal government is compelling them not to enforce state law.  But there is not much of a difference between the federal government ordering the states to do something they are not required to do and prohibiting them from doing something they are permitted to do.  The former is direct commandeering and the latter is preventive commandeering.  Both forms violate the constitutional principle of dual sovereignty.

*Id.* at 883-84.

Recent authorities further bolster this conclusion.  In *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 475, 138 S. Ct. 1461, 1478, 200 L. Ed. 2d 854 (2018), the

---

set forth within are fully incorporated by reference into Ms. Collins' Objection and Motion.

3 Counsel is not aware of any federal court decision to date addressing the impact of *Printz* and the modern anti-commandeering doctrine upon prior decisions regarding 18 U.S.C. § 6002.

Court rejected as "empty" the purported distinction between commanding an affirmative action and imposing a prohibition in the anti-commandeering context. *Printz* and *Murphy* lend credence to more robust challenges to federal impositions on state sovereignty, particularly when those impositions implicate state criminal prosecutions. *See New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 394 (S.D.N.Y. 2019) (Rakoff, J.) (applying *Murphy* and *Printz* and finding that New York had stated a valid Tenth Amendment anti-commandeering claim in alleging interference with state court operations and criminal prosecutions).

In light of the Supreme Court's modern anti-commandeering jurisprudence—which long post-dates the Court's last substantive adjudication of the federal immunity statute's application to state prosecutions—the conclusion that 18 U.S.C. § 6002 can preempt state prosecution is no longer tenable.  As such, the statute is unconstitutional on its face to the extent it preempts state prosecutions, and this Court should withdraw the immunity order in this matter accordingly.4

II.    **18 U.S.C. § 6002 Violates the Fifth Amendment Because It Does Not Constitutionally Provide a Level of Immunity Coextensive With the Fifth Amendment.**

Ms. Collins incorporates by reference Section I, *supra*.  *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972)—which predates *Printz* by twenty-five years—assumed that the federal immunity statute could preempt state prosecutions when it held the protections of 18 U.S.C. § 6002 are coextensive with the Fifth

---

4  Although federal immunity covers only the use and derivative use of testimony, as a practical matter, if state prosecutors learn of criminal activity through immunized testimony, it is virtually certain that the person cannot be prosecuted.

Amendment privilege.5  As set forth above, regardless of the validity of this assumption at the time *Kastigar* was decided, it has been undermined by subsequent jurisprudence and is no longer tenable.  Since 18 U.S.C. § 6002 cannot constitutionally preempt state prosecutions, it is necessarily *not* coextensive with the scope of the Fifth Amendment privilege.

Moreover, this Court need not hold that 18 U.S.C. § 6002 is constitutionally invalid to find that the substantial uncertainty on this question is enough for Ms. Collins to retain her Fifth Amendment privilege.  It is Black Letter Law that a witness' assertion of the privilege must be sustained as proper unless it is "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) *cannot possibly* have [a] tendency to incriminate."  *Hoffman v. United States*, 341 U.S. 479, 488, 71 S. C.t 814, 819, 95 L. Ed. 1118 (1951) (emphasis in original).  Given the substantial uncertainty as to the proper scope of the federal immunity statute in light of *Printz, et al.*, it cannot be said that compelled grand jury testimony "*cannot possibly* have [a] tendency to incriminate" Ms. Collins in a state criminal proceeding.

---

5 In addition to the other arguments set forth *infra*, Ms. Collins submits that *Kastigar* was wrongly decided to the extent that it held use immunity coextensive with the Fifth Amendment.  *See* Scott Clair, Dual Sovereignty and Preventive Commandeering: Why the Federal Immunity Statute Cannot Preempt State Prosecutions, 2003 U. Ill. L. Rev. at 866-67.  Ms. Collins incorporates by reference all arguments and authorities supporting a more expansive interpretation of the Fifth Amendment set forth in Exhibit A.  Of course, Ms. Collins recognizes that this Court is bound by *Kastigar* to the extent it does not conflict with subsequent Supreme Court jurisprudence, and that therefore this particular objection is likely currently foreclosed in this Court.

*See id.*6  An order pursuant to 18 U.S.C. § 6002 would therefore violate Ms. Collins'

Fifth Amendment privilege.

    III.    **The United States Should be Required to Demonstrate Its Compliance With 18 U.S.C. § 6003.**

    18 U.S.C. § 6003 sets forth the procedures required for the United States to obtain

an immunity order pursuant to 18 U.S.C. § 6002.  At this time, Ms. Collins has no

information indicating whether the procedures—e.g., approval of the Attorney General or

appropriate designated subordinate—were followed prior to issuance of the immunity

order.  Should her other objections to the immunity order not be sustained, Ms. Collins

respectfully requests that this Court require the United States to demonstrate compliance

with the mandates of 18 U.S.C. § 6003.

    WHEREFORE, for the foregoing reasons, Ms. Collins objects to the grant use of

immunity in this matter pursuant to 18 U.S.C. § 6002 and requests a hearing thereon.

               Respectfully Submitted,

               MICAIAH COLLINS

               By:   /s/ Jonathan Sidney
               Jonathan Sidney

---

6 The Supreme Court's increasingly common and high-profile practice of departing from previously settled legal tests and principles lends further support for the proposition that witnesses purportedly granted immunity under 18 U.S.C. § 6002 should not be compelled to relinquish their Fifth Amendment rights and incriminate themselves with respect to potential state criminal prosecutions, given the uncertain legal landscape on this issue.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L.E.2d 832 (2024); *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 388, 142 S. Ct. 2288, 213 L.E.2d 545 (2022).

Jonathan Sidney, *Pro Hac Vice*
CO 52463
OH 0100561
Climate Defense Project
P.O. Box 97
Forest Hill, WV
Email: jsidney@climatedefenseproject.org
Telephone: (510) 318-1549
Counsel for Witness Micaiah Collins

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2025, I filed the foregoing Memorandum in Support of Objection to Immunity Order and Motion for Hearing Thereon with the Clerk of the Court via email to intake2_pawd@pawd.uscourts.gov and simultaneously served Assistant United States Attorney Nicole Vasquez Schmitt by carbon copy to nicole.vasquez.schmitt@usdoj.gov.


/s/ Jonathan Sidney
Jonathan Sidney

DUAL SOVEREIGNTY AND PREVENTIVE
COMMANDEERING: WHY THE FEDERAL IMMUNITY
STATUTE CANNOT PREEMPT STATE PROSECUTIONS

SCOTT CLAIR

*This note analyzes whether the federal immunity statute may forbid states from prosecuting state crimes when the violation of state law was discovered through federally immunized testimony. Early cases dealing with the immunity statute held that federal immunity could not bar subsequent state prosecutions, but during the Warren Court era, the Supreme Court changed course, holding that federal immunity does bar subsequent state prosecutions.*

*In Printz v. United States, the Supreme Court held that commandeering a state's executive branch violates the constitutional principle of dual sovereignty. This note applies the* Printz *rationale to the federal immunity statute, reasoning that a bar on state prosecutions based on federally immunized testimony would be a form of commandeering. It is preventive commandeering because the federal government prohibits state officials from enforcing state law.*

*To remedy the problem of preventive commandeering, states should amend their immunity statutes to bar state prosecutions based on federally immunized testimony. This solution applies the theory of cooperative federalism, illustrating that it is sometimes more efficient for states to work with the federal government in areas of concurrent jurisdiction.*

## I. INTRODUCTION

In *Printz v. United States*,[1] the Supreme Court struck down as unconstitutional a portion of the Brady Handgun Violence Protection Act.[2] The statute's requirement that state law enforcement officers conduct background checks on prospective gun purchasers violated the constitutional principle of dual sovereignty, according to the Court, because it "commandeered" state officials into enforcing federal law.[3] As a result of the decision, the constitutionality of several other federal statutes that

---

1. 521 U.S. 898 (1997).
2. 18 U.S.C. § 922 (1994).
3. *See Printz*, 521 U.S. at 935 ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

arguably commandeer state executive officials has been placed in doubt.[4] Given the ruling in *Printz*, the federal immunity statute[5] should be added to that list.

The immunity statute, however, poses a peculiar federalism problem.[6]  The statute does not directly commandeer state officials into executing its provisions; rather, when federal officials invoke the statute, they prevent state officials from prosecuting witnesses whose violation of state law was discovered through federally immunized testimony.[7]  The federal immunity statute appears, then, to be a form of preventive commandeering:  it preempts the states in certain situations from carrying out one of their legitimate functions to further a federal objective.

The current immunity statute declares that "no testimony or other information compelled under the order . . . may be used against the witness in any criminal case . . . ."[8]  In *Adams v. Maryland*,[9] the Court interpreted the phrase "in any criminal case" to cover both federal and state criminal proceedings.[10]  Therefore, the statute prohibits states from using testimony immunized in a federal proceeding in state court prosecutions, as well as preventing federal prosecutors from using the testimony in federal prosecutions.

However, this type of preventive commandeering had not always been permissible.  Notwithstanding its initial equivocation on the issue,[11] the Court had held for nearly fifty years that under the principle of dual sovereignty a federal grant of immunity could no more bar a subsequent state prosecution than a state grant of immunity could bar a subsequent federal prosecution.[12]  Despite the increasing overlap in federal and state

---

4.  For a list of potential statutes affected by the *Printz* decision, see generally Evan H. Caminker, Printz, *State Sovereignty, and the Limits of Formalism*, 1997 SUP. CT. REV. 199, 200 n.6 (listing more than ten recently enacted federal statutes that are potentially unconstitutional after *Printz*).

5.  18 U.S.C. § 6002 (2000).

6.  This note treats the federal immunity statute as commandeering state executive officials, such as prosecutors.  An argument can be made that the statute commandeers state judiciary officials, which remains permissible after *Printz*.  *See Printz*, 521 U.S. at 907 ("These early laws establish, at most, that the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions, insofar as those prescriptions related to matters appropriate for the judicial power.").  However, judicial commandeering does not seem to permit Congress, under its Article I powers, to dictate to state courts the procedures it must follow in cases that arise under state law.  *See generally* Anthony J. Bellia Jr., *Federal Regulation of State Court Procedures*, 110 YALE L.J. 947 (2001).  Nevertheless, as the Court has not ruled on this issue, the possibility remains open.  As Bellia aptly stated, "Federal laws regulating state court procedures stand at the next frontier of federalism." *Id.* at 950.

7.  The federal immunity statute no longer provides absolute, or transactional, immunity; it only prohibits prosecutors (both federal and state) from the direct or derivative use of a witness's testimony at a subsequent trial of that witness.  *See* Kastigar v. United States, 406 U.S. 441, 453 (1972); *infra* notes 58–62 and accompanying text.

8.  18 U.S.C. § 6002.

9.  347 U.S. 179 (1954).

10.  *See id.* at 182 (holding that similar language from a previously enacted federal immunity statute barred a state court prosecution based on the petitioner's immunized testimony before a congressional committee); *infra* notes 42–48 and accompanying text.

11.  *See infra* notes 24–30 and accompanying text.

12.  *See infra* notes 31–39 and accompanying text.

criminal jurisdiction, with its periodic tension between federal and state law enforcement initiatives, the Court had ruled that the dual sovereignty principle (the principle that the federal and state governments each exercise direct power over citizens without interference from the other) still governed.[13]

The main thesis of this note is that the federal immunity statute violates the principle of dual sovereignty that the Court enunciated in *Printz* because it commandeers the states into enforcing federal law. While this type of preventive commandeering is different than directly commanding state officials to enforce federal law, it still falls within the ambit of *Printz*'s proscription against executive commandeering. Thus, *Printz* has revitalized the pre-*Adams* view that dual sovereignty prohibits the federal immunity statute from preempting a subsequent state prosecution.

Part II of this note explores the evolution of the federal immunity statute, focusing on its connection with the Fifth Amendment right against self-incrimination and the principle of dual sovereignty. Part III lays out the Court's decision in *Printz*, which the Court supports by analyzing the historical understanding of executive commandeering, the structure of the Constitution, and its previous jurisprudence. Part IV is broken into three sections. The first analyzes the holding in *Printz*, concluding that the decision is ultimately a reification of the dual sovereignty principle. The second section critiques the Court's terse decision in *Adams*, and posits that the Court's failure to address the ramifications of the growth in concurrent criminal jurisdiction and its inchoate articulation of the privilege against self-incrimination resulted in a decision that essentially jettisoned the dual sovereignty principle. The third section concludes that the *Printz* decision revives the pre-*Adams* view of the federal immunity statute; that is, the federal immunity statute violates the principle of dual sovereignty because it is a form of preventive commandeering.

To accommodate the federal interest in enforcing its criminal laws and promote cooperative federalism between the state and federal governments, part V recommends that states enact statutes preventing their prosecutors from using federally immunized testimony in state court proceedings. Part VI concludes with a brief summary of the note.

## II.  HISTORY OF THE FEDERAL IMMUNITY STATUTE

The application of the federal immunity statute had raised two main issues from its inception until the Warren Court era. The first is the scope of the Fifth Amendment privilege against self-incrimination; the second is the federal government's ability to bar state prosecutions through immunity grants. Although both of these issues were eventually

---

13.   *See infra* notes 116–28 and accompanying text.

866                    UNIVERSITY OF ILLINOIS LAW REVIEW                    [Vol. 2003

resolved, the history of the Court's views is potentially significant in light
of *Printz*.

### A.   Origins of the Federal Immunity Statute: The Scope of the Self-Incrimination Privilege and the Question of Dual Sovereignty

   Statutory grants of immunity, which are used to secure testimony
from witnesses invoking the privilege against self-incrimination, were
adopted in England well before the ratification of the Constitution.[14]
The colonies eventually adopted them as well, and they were subse-
quently reenacted by the states.[15]   In 1857, the federal government en-
acted its first immunity statute,[16] and the Supreme Court first addressed
the constitutionality of a federal immunity statute in *Counselman v.
Hitchcock*[17] thirty-five years later.[18]

   The Court in *Counselman* invalidated the immunity statute because
it afforded less protection than that required by the Fifth Amendment.[19]
Since the immunity statute only prevented the witness's grand jury testi-
mony from being used against him at trial, the Court noted that the gov-
ernment still could use the testimony to "search out" other evidence to
convict him.[20]   Because this derivative evidence would be admissible un-
der the statute, the defendant's testimony would still be used to incrimi-
nate him, which the Court held would violate the Fifth Amendment pro-

---

   14.   *See* Kastigar v. United States, 406 U.S. 441, 445 n.13 (1972); 3 WAYNE R. LAFAVE ET AL.,
CRIMINAL PROCEDURE § 8.11(a) (2d ed. 1999); *see also* 8 JOHN HENRY WIGMORE, EVIDENCE IN TRI-
ALS AT COMMON LAW § 2281 (McNaughton rev. ed. 1961); John Fabian Witt, *Making the Fifth: The
Constitutionalization of American Self-Incrimination Doctrine, 1791–1903*, 77 TEX. L. REV. 825, 846–48
(1999).
   15.   *See* LAFAVE ET AL., *supra* note 14, § 8.11(a); Witt, *supra* note 14, at 846–48.
   16.   Act of Jan. 24, 1857, ch. 19, 11 Stat. 155–56.  For a brief discussion on the history behind the
1857 Act, see Robert G. Dixon, Jr., *The Fifth Amendment and Federal Immunity Statutes*, 22 GEO.
WASH. L. REV. 447, 450–54 (1954).
   Although there was no federal immunity statute before 1857, common law immunity grants had
been utilized in federal court to secure testimony from witnesses.  *See* Witt, *supra* note 14, at 844–45.
As Witt's article delineates, the privilege against self-incrimination itself was treated as a common-law
privilege for several decades after the adoption of the Constitution while the Fifth Amendment provi-
sion against self-incrimination was ignored by most courts.  *See id.* at 834–43; *see also* LEONARD W.
LEVY, ORIGINS OF THE FIFTH AMENDMENT: THE RIGHT AGAINST SELF-INCRIMINATION 429 (1968)
("In Burr's trial, Chief Justice Marshall, without referring to the constitutional clause, again sustained
the right of a witness to refuse answer to an incriminating question.  The courts have always assumed
that the meaning of the constitutional clause is determined by the common law.").
   17.   142 U.S. 547 (1892).
   18.   The statute in question was not the 1857 Act; it was an 1868 law entitled "An Act for the
Protection in Certain Cases of Persons Making Disclosures as Parties, or Testifying as Witnesses." Act
of Feb. 25, 1868, ch. 13, 15 Stat. 37.  Before the adoption of the current immunity statute, 18 U.S.C.
§ 6002 (2000), there had been more than forty immunity statutes scattered throughout the United
States Code to cover various regulatory activities of the federal government.  *See* Comment, *The Fed-
eral Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope*, 72 YALE
L.J. 1568, 1570 (1963).
   19.   *See Counselman*, 142 U.S. at 564–65 ("The constitutional provision distinctly declares that a
person shall not 'be compelled in any criminal case to be a witness against himself;' and the protection
of [the immunity statute] is not coextensive with the constitutional provision.").
   20.   *See id.* at 564.

hibition.[21]  The Court, however, went even further in its view of the privi-
lege against self-incrimination, stating that the statute must provide full
immunity from prosecution to satisfy the Fifth Amendment.[22]

Congress, following the Court's advice, shortly after *Counselman*
passed a statute that provided for full immunity from prosecution in ex-
change for a witness's compelled testimony.[23]   Three years later, the
Court upheld the constitutionality of the statute in *Brown v. Walker*.[24]  In
*Brown*, the defendant argued that the privilege against self-incrimination
was absolute and protected any witness who did not wish to testify, re-
gardless of whether he were given immunity from prosecution.[25]   The
Court responded that if the possibility of prosecution is nullified, then
the privilege against self-incrimination "ceases to apply."[26]

Furthermore, the Court in *Brown* noted that under the Supremacy
Clause[27] a federal immunity statute also would protect the witness against
state prosecution for his testimony.[28]  The Court stated, "The act in ques-
tion contains no suggestion that it is to be applied only to the federal
courts."[29]  The dissent, however, vigorously opposed this view:

> It is, indeed, claimed that the provisions under consideration would
> extend to the state courts, and might be relied on therein as an an-

---

21.  *See id*. at 564–65.  The view of the Congress that adopted the statute at issue, as well as that
of many states, was that "testimonial immunity" was all that was required to protect the privilege
against self-incrimination.  *See* Akhil Reed Amar & Renée B. Lettow, *Fifth Amendment First Princi-
ples: The Self-Incrimination Clause*, 93 MICH. L. REV. 857, 859 (1995).  Amar and Lettow forcefully
argue that the current Court should adopt this "testimonial immunity" rule for the Fifth Amendment
privilege.  *See id.*  However, the history of the common-law privilege against self-incrimination sup-
ported the absolute or "transactional immunity" rule.  *See* Witt, *supra* note 14, at 904–05.

22.  *Counselman*, 142 U.S. at 586 ("In view of the constitutional provision, a statutory enactment,
to be valid, must afford absolute immunity against future prosecution for the offence to which the
question relates.").

23.  *See* Act of Feb. 11, 1893, ch. 83, 27 Stat. 443 ("[N]o person shall be excused from attending
and testifying . . . .  But no person shall be prosecuted or subjected to any penalty or forfeiture for or
on account of any transaction, matter or thing, concerning which he may testify . . . in any such case or
proceeding . . . ."); *see also* Comment, *supra* note 18, at 1573–74 (discussing Congress's legislation as a
specific response to *Counselman*).

24.  161 U.S. 591 (1896).

25.  *See id*. at 595.

26.  *Id*. at 597.  The Court also ruled that it is irrelevant that the defendant's testimony might
cause him to be disgraced in the community because the Fifth Amendment only protects against
criminal prosecutions, not public opprobrium, *see id*. at 605, though the dissent strongly objected to
this.  *See id*. at 633–37 (Field, J., dissenting).  Sixty years later, the Court directly addressed this issue
again in *Ullmann v. United States*, 350 U.S. 422 (1956).  The defendant in *Ullmann* refused to testify
before a grand jury investigating activities of the Communist Party, despite the prosecution's grant of
immunity.  *Id*. at 424–25.  He argued that if his membership in the party were made public he would be
unable to work and would be forced to endure significant hardships in his life.  *Id*. at 430.  Neverthe-
less, the Court upheld the principle from *Brown* that the Fifth Amendment privilege only protects
against criminal prosecution.  *Id*. at 438–39.  However, it is interesting to note that the common-law
privilege against self-incrimination as employed in early-nineteenth-century American courts pro-
tected not only against potential criminal liability, but also against disgrace in the community and
against exposure to civil liability.  *See* Witt, *supra* note 14, at 840–41; *see also Brown*, 161 U.S. at 633–
37 (Field, J., dissenting).

27.  U.S. CONST. art VI.

28.  *See Brown*, 161 U.S. at 606.

29.  *Id*. at 607.

868          UNIVERSITY OF ILLINOIS LAW REVIEW          [Vol. 2003

swer to such an indictment. We are unable to accede to such a sug-
gestion. As Congress cannot create state courts, nor establish the
ordinary rules of property and of contracts, nor denounce penalties
for crimes and offenses against the states, it cannot prescribe rules
of proceeding for the state courts.[30]

Although it would seem that the issue was decided, it remained unre-
solved for some time.

### B.    The Middle Years: Reification of Dual Sovereignty and the Sovereign Specific Privilege Against Self-Incrimination

The issue of whether a federal immunity grant could preempt a
state prosecution was addressed again in *Hale v. Henke*.[31] In *Hale*, the
Court held that a federal witness immunized from prosecution could not
invoke his Fifth Amendment right because of fear of state prosecution.[32]
However, the Court did not rely on the Supremacy Clause argument of
*Brown*; instead, it said that since the possibility of state prosecution was
so remote, the defendant was not entitled to rely on the privilege.[33] Fur-
thermore, the Court added that the immunity given by the federal gov-
ernment could only bind the "same sovereign,"[34] contradicting the
statement in *Brown*.

---

30. *Id.* at 623 (Shiras, J., dissenting). This disagreement is at the very core of this note's thesis. Interestingly, a few Congressmen during the debate that preceded the first federal immunity statute's enactment, 11 Stat. 155, briefly mentioned the issue of whether the immunity statute would be able to bind the states. *See* CONG. GLOBE, 34th Cong., 3d Sess. 429 (1857) (statement of Rep. Washburn); *id.* at 434–35 (statement of Sen. Hale).

31. 201 U.S. 43 (1906).

32. *See id.* at 69.

33. *Id.* "The further suggestion that the statute offers no immunity from prosecution in the state courts was also fully considered in *Brown v. Walker* and held to be no answer." *Id.* at 68. This might seem to indicate that the Court was holding to *Brown's* view that under the Supremacy Clause, a federal immunity statute bars state prosecution. *See supra* notes 27–29 and accompanying text. However, the Court was referring to *Brown's* statement that even if it were possible that the defendant's disclosure would subject him to state prosecution ("the criminal laws of some other sovereignty"), the possibility is too remote to justify allowing the defendant to invoke the privilege. *See Brown*, 161 U.S. at 608. The Court in *Hale* did not even address the Supremacy Clause argument.

34. *See Hale*, 201 U.S. at 69. To support this position the Court also relied on its previous ruling in *Jack v. Kansas*, 199 U.S. 372 (1905). *See Hale*, 201 U.S. at 68–69. In *Jack*, the Court affirmed a state court conviction for contempt against the defendant, who, although given immunity by the state for his testimony, refused to testify for fear of federal prosecution. *Jack*, 199 U.S. at 382. The Court said that there was not "any real danger of a Federal prosecution," so the defendant could not rely on his state privilege against self-incrimination. *Id. But see* Feldman v. United States, 322 U.S. 487 (1944). In *Feldman*, the Court upheld the defendant's conviction even though federal prosecutors used evidence that the defendant produced to the State under a state grant of immunity. *Id.* at 492–93. As with the federal witnesses who feared state prosecution, this ruling was justified by the separate sovereign doctrine put forth in *Hale*. *Id.* With regard to the Fifth Amendment privilege, these cases have been overruled by the Court's decision in *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 77–78 (1964). However, the Fifth Amendment privilege cannot be invoked for fear of prosecution by a foreign, as opposed to a separate domestic, sovereign. *See* United States v. Balsys, 524 U.S. 666, 669 (1998) (holding that resident alien suspected of being Nazi war criminal could not invoke privilege against self-incrimination in federal court for fear of prosecution by foreign sovereign).

No. 3]      FEDERAL IMMUNITY COMMANDEERING STATES         869

The Court solidified this view in *United States v. Murdock*.[35]  In *Murdock*, the Court directly held that a witness in federal court could not refuse to answer questions for fear of state prosecution because the Fifth Amendment safeguard against self-incrimination protects the witness only against testimony that would lead to prosecution by the federal government.[36]  The safeguard does not protect against testimony that would expose a witness to prosecution by a separate sovereign, such as a state.[37]

Although a federal immunity statute was not at issue in *Murdock*,[38] the Court cemented its position from *Hale* that federal immunity only prohibits the federal government from subsequently prosecuting the witness.  "The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination."[39]  Thus, after *Hale* and *Murdock*, not only could a federal immunity statute not bar a state prosecution, but a federal witness could not even invoke his Fifth Amendment protection to safeguard against a possible state prosecution.  Under the Warren Court, however, both of these positions would be overturned.

### C.    The Current View of the Federal Immunity Statute: The Death of Dual Sovereignty and the Expansion and Contraction of the Self-Incrimination Privilege

In *Adams v. Maryland*,[40] the State used the defendant's immunized testimony before a Senate Committee, in which he admitted to having run a gambling business in Maryland, to convict him of conspiring to violate the state's anti-lottery laws.[41]  The Court, however, reversed the defendant's conviction, holding that because his testimony before Congress was immunized, he could not be prosecuted in "any court" under the statute, including state courts.[42]  The Court stated:

Article I of the Constitution permits Congress to pass laws 'necessary and proper' to carry into effect its power to get testimony. . . . And, since Congress in the legitimate exercise of its powers enacts 'the supreme Law of the Land,' state courts are bound by [the immunity statute], even though it affects their rules of practice.[43]

---

35.   284 U.S. 141 (1931).
36.   *Id.* at 149.
37.   *Id.*
38.   The defendant refused to testify because his testimony would implicate him in state crimes, though he did not claim that it would implicate him in any federal crime.  *Id.* at 148.  Thus, there was no need for the federal government to give him immunity to secure his testimony.
39.   *Id.*
40.   347 U.S. 179 (1954).
41.   *Id.* at 179–80.
42.   *Id.* at 181–82.
43.   *Id.* at 183.

In its relatively brief opinion, the Court cited *Brown* in support of its decision,[44] though it did not discuss the subsequent separate sovereign doctrine rulings that led to the rejection of this view.[45]  After *Adams*, then, a state's interest in prosecuting violators of its crimes must give way to the federal interest in securing immunized testimony when investigating and prosecuting its own crimes.[46]  Hence, dual sovereignty does not apply.

The Court confronted the converse problem nearly a decade later in *Murphy v. Waterfront Commission of New York Harbor*.[47]  The defendant in *Murphy* refused to testify in front of a state administrative body despite receiving a state grant of immunity out of fear that his testimony could be used to prosecute him for violations of federal law.[48]  The Court, overturning its previous view on the privilege against self-incrimination, held that a defendant does not have to give testimony in one jurisdiction (here, the state) if his answer might incriminate him in another jurisdiction (the federal).[49]  However, the Court decided that to accommodate states' interests in investigating crime, it would prohibit federal officials "from making any such use of compelled testimony and its fruits."[50]  Thus, as a prophylactic measure, witnesses testifying under state grants of immunity could not refuse to testify for fear of federal prosecution because the Court would prohibit federal prosecutors from using the testimony.[51]

Although it only confronted the issue of a state grant of immunity, not a federal grant, the Court's decision in *Murphy* had a major impact on the current federal immunity statute.  In barring federal officials from using testimony immunized in a state proceeding, the Court said that the federal government was only barred from the direct or derivative use of a state witness's immunized testimony.[52]  "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."[53]  This rule,

---

44.  *See id.*
45.  *See supra* notes 31–39 and accompanying text.
46.  The principle that the federal government can grant immunity from state prosecution was reaffirmed in *Ullmann v. United States*, 350 U.S. 422, 434–36 (1956); *see also* Reina v. United States, 364 U.S. 507, 510–12 (1960) ("Congress may legislate immunity restricting the exercise of state power to the extent necessary and proper for the more effective exercise of a granted power, and distinctions based upon the particular granted power concerned have no support in the Constitution.").
47.  378 U.S. 52 (1964).
48.  *See id.* at 53–54.
49.  *Id.* at 77–78 ("[W]e hold that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.").  The same day as the *Murphy* decision, the Court held that the Fifth Amendment privilege against self-incrimination is applicable to the states through the Fourteenth Amendment.  Malloy v. Hogan, 378 U.S. 1 (1964).
50.  *Murphy*, 378 U.S. at 79.
51.  *See id.*
52.  *See id.*
53.  *Id.* at n.18.

No. 3]        FEDERAL IMMUNITY COMMANDEERING STATES        871

however, was in direct conflict with the Court's decisions in *Counselman* and *Brown* that absolute immunity from prosecution was required for an immunity statute to satisfy the Fifth Amendment.[54]  Subsequently, Congress replaced the federal immunity laws that provided complete immunity from prosecution with the current immunity statute.[55]

Within two years of the statute's adoption, the Court in *Kastigar v. United States*[56] upheld the new immunity statute against constitutional attack.  Despite the defendant's reliance on *Brown* and *Counselman*, the Court held that the statute was coextensive with the protections afforded by the Fifth Amendment.[57]  Therefore, the government could compel the defendant's testimony once it granted him immunity under the statute.[58]  The Court further held that before the government initiates a prosecution against an immunized witness, it must affirmatively prove that its evidence was derived from "a legitimate source wholly independent of the compelled testimony."[59]  Since *Kastigar*, the federal use immunity statute has withstood challenge.[60]

## III. THE *PRINTZ* DECISION

The Supreme Court in *Printz v. United States*[61] held that the provision of the Brady Handgun Prevention Act[62] that required state officials to perform background checks of handgun purchasers was unconstitutional because it commandeered state officials into executing federal

54.  *See supra* notes 22–26 and accompanying text.

55.  18 U.S.C § 6002 (2000).

56.  406 U.S. 441 (1972).

57.  *See id.* at 462.

58.  *See id.* at 453.  The Court characterized as dicta the *Counselman* Court's statement that absolute immunity from prosecution under an immunity grant is necessary under the Fifth Amendment. *Id.* at 454–55.  It went on to say that the issue of whether use and derivative use immunity was constitutional was not presented in *Brown* because the statute at issue in that case was "clearly sufficient" to protect the privilege against self-incrimination.  *Id.* at 455 n.39.

59.  *Id.* at 460.  This is often a difficult burden for the government to sustain.  *See, e.g.*, United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991); United States v. North, 910 F.2d 843, 872–73 (D.C. Cir. 1990), *modified in part*, 920 F.2d 940 (D.C. Cir. 1990).  In each case, the court overturned the convictions of the Iran-Contra figures because the prosecution had not met the *Kastigar* burden.  *See Poindexter*, 951 F.2d at 374–77; *North*, 910 F.2d at 853–73.  The Independent Counsel's evidence had been gathered prior to each defendants' immunized testimony before a congressional committee.  The court, however, wrote that the extensive publicity of the congressional hearings had served to refresh witnesses' memories.  *Poindexter*, 951 F.2d at 374–77; *North*, 910 F.2d at 853–73.  Therefore, the government could not meet its burden that the evidence was "wholly independent" of the compelled testimony.  *See Poindexter*, 951 F.2d at 377; *North*, 910 F.2d at 872–73.

60.  *See, e.g.*, United States v. Gallo, 863 F.2d 185, 190 (2d Cir. 1988).

61.  521 U.S. 898 (1997).  The *Printz* decision has generated a voluminous backlash from legal scholars who have criticized Justice Scalia's view of history in supporting the decision in the case.  *See, e.g.*, Caminker, *supra* note 4; Vicki C. Jackson, *Federalism and the Uses and Limits of Law:* Printz *and Principle?*, 111 HARV. L. REV. 2180 (1998); Gene R. Nichol, *Justice Scalia and the* Printz *Case: The Trials of an Occasional Originalist*, 70 U. COLO. L. REV. 953 (1999).  *But see* Bradford R. Clark, *Translating Federalism: A Structural Approach*, 66 GEO. WASH. L. REV. 1161, 1192 (1998).

62.  18 U.S.C. § 922 (2000).

law.[63]  In reaching this view, Justice Scalia, writing for the Court, stated that "because there is no constitutional text speaking to this precise question" of commandeering, the answer must be found in "historical understanding and practice, in the structure of the Constitution, and in the jurisprudence of this Court."[64]

### A.  Historical Understanding and Practice

The Court first looked to whether the earliest Congresses enlisted state officials to enforce federal laws to determine if the founders' understanding of the Constitution permitted executive-commandeering.[65]  It found that the only form of commandeering undertaken by the first Congresses were directives to state court judges to enforce federal laws insofar as those laws related to their judicial duties.[66]  The Court noted that this was unsurprising because Article III, Section I of the Constitution contemplated that the state courts would adjudicate federal cases.[67]

Next, the Court looked to the Federalist papers to discern the founders' views on the issue of executive-commandeering.[68]  In a spirited joust with the dissent over the meaning of various passages from the Federalist papers, the Court concluded that the founders expected that state executive officials would help enforce federal law.[69]  However, the Court stated that there was no indication that, despite the founders' expectations of state cooperation, the founders believed the federal government could require state executives to enforce federal law.[70]

Finally, the Court looked to whether any executive-commandeering statutes had been enacted in the periods following the founding of the national government by focusing on two statutes.[71]  The first statute, from 1882, enlisted state officials to "take charge of the local affairs of immigration."[72]  The Court noted that this statute was not a mandate; rather, it authorized the Secretary of the Treasury to enter into contracts with those state officials who wanted to perform these immigration enforcement duties.[73]  The second statute, passed during World War I, em-

---

63.  Although the Act "commandeered" state officials into performing background checks on prospective gun purchasers, the measure was only temporary while the Attorney General established a national background check system. *See Printz*, 521 U.S. at 904.  That system was supposed to become operational within five years of the bill's passage. *See id.* at 902.  However, the fact that the law only temporarily commandeered the state officials was not relevant to the Court's analysis. *See id.* at 905.

64.  *Id.*

65.  *See id.*

66.  *See id.* at 907.

67.  *See id.*

68.  *See id.* at 910.

69.  *See id.* at 910–15.

70.  *See id.* "But none of these statements [from the Federalist papers] necessarily implies—what is the critical point here—that Congress could impose these responsibilities *without the consent of the States.*" *Id.* at 910–11.

71.  *See id.* at 916–18.

72.  *See id.* at 916

73.  *See id.*

powered the President "to utilize the service" of state officials in instituting the draft.[74] The Court characterized this statute as ambiguous as to whether it provided for executive-commandeering, and noted that President Woodrow Wilson's implementation of the statute took the form of requesting help from state executives, not compelling their assistance.[75] The Court's ultimate conclusion as to these statues is that they reinforce the view that the states were expected, but not required, to assist in enforcing federal law.[76]

With regard to the more recent statutes involving executive-commandeering, the Court dismissed their persuasive force because they "are of such recent vintage that they are no more probative than the statute before us of a constitutional tradition that lends meaning to the text."[77] Finding that history did not support executive-commandeering, the Court then analyzed whether the Constitution's structure supported the view.

### B.  Structure of the Constitution

The Court's structural analysis was based foremost on the premise that the Constitution set up a system of "dual sovereignty."[78] This dual sovereignty, the Court stated, is implicit in several textual provisions in the Constitution, including the Tenth Amendment.[79] The Court noted that the founders rejected the system they had created under the Articles of Confederation, in which the federal government acted on the people through the states, because it was "both ineffectual and provocative of federal-state conflict."[80] Under the Constitution's dual sovereignty, the states and the federal government each have direct control over the people, and each is sovereign within its own sphere of power.[81] This system, the Court wrote, ensures that a state "will represent and remain accountable to its own citizens"[82] and that a citizen's liberty will be protected against encroachment by a balance of power between the state and federal governments.[83] The Court stated that if the federal government

---

74. *See id.* at 916–17.
75. *See id.* at 917.
76. *See id.* at 916–17.
77. *Id.* at 918.
78. *Id.*
79. *See id.* at 919. Justice Scalia's opinion stresses that the structural argument of dual sovereignty is not based exclusively, or even primarily, on the Tenth Amendment. *See id.* at 923 n.13. However, both concurring opinions stress that the provision of the Brady Act at issue is unconstitutional because it violates the Tenth Amendment. *Id.* at 935–36 (O'Connor, J., concurring); *id.* at 936 (Thomas, J., concurring).
80. *Id.* at 919.
81. *See id.* at 920.
82. *Id.*
83. *See id.* at 921.

874          UNIVERSITY OF ILLINOIS LAW REVIEW          [Vol. 2003

were able to compel a state's executive officers into enforcing federal law, this integral balance of power would be upset.[84]

Also, the Court's structural analysis stressed that executive-commandeering would upset the separation of powers between the executive and legislative branches of the federal government.[85] "That unity [of federal executive authority] would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws."[86]

Given this, the Court concluded that the executive-commandeering portion of the Brady Act violated the state sovereignty principle implicit in the Constitution's structure.[87] The Court added, in a rebuttal to the dissent, that although Congress's power under the Commerce Clause permits it to regulate the sale of handguns, violating the state sovereignty principle by executive-commandeering is not a "proper" means of executing this power under the Necessary and Proper Clause.[88] Finally, the Court examined whether its prior cases supported the power of the federal government to compel the states into enforcing federal law.

### C.  Jurisprudence of the Court

The Court noted that federal commandeering of state governments is such a "novel phenomenon" that it had not even confronted the issue until the late 1970s.[89] At that time, some of the states were challenging federal environmental rules that required them to regulate automobile emissions, but when the issue reached the Court it was vacated as moot because the federal government had declined to defend the constitutionality of the rules.[90] The Court stated that in the 1980s it had rejected the idea of federal commandeering of state governments[91] when in two sepa-

---

84. *See id.* at 922. "The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States." *Id.*

85. *See id.* at 922–23.

86. *Id.* at 923.

87. *See id.* at 922–23.

88. *See id.* at 923–24; *see also* David E. Engdahl, *The Necessary and Proper Clause as an Intrinsic Restraint on Federal Lawmaking Power*, 22 HARV. J.L. & PUB. POL'Y 107 (1998). "I want to emphasize a relatively unnoticed yet crucial change that I think is taking place—the return of the Necessary and Proper Clause as a distinct ground of constitutional analysis and an intrinsic restraint on federal lawmaking power." *Id.* at 107.

89. *See Printz*, 521 U.S. at 925.

90. *See id.* (discussing EPA v. Brown, 431 U.S. 99 (1977) (per curiam)).

91. All of the commandeering cases the Court discusses considered federal commandeering of state legislatures. *Printz* is the first case dealing with direct federal commandeering of state executives, though if the federal government tells state legislatures to pass certain laws, it indirectly is commandeering state executive officers to enforce those laws.

CLAIR.DOC                                                8/29/2003 3:19 PM

rate cases it upheld federal statutes after determining that they did not
commandeer the states.[92]

Finally, the Court noted that it had directly rejected the principle
that the federal government could commandeer the state legislatures in
*New York v. United States*.[93] Although none of these cases dealt with the
question of whether the federal government directly could conscript state
executive officials into enforcing federal law (they dealt directly with the
conscription of state legislatures), the Court held that the distinction was
not an important one.[94] "Even assuming, moreover, that the Brady Act
leaves no 'policymaking discretion' with the States, we fail to see how
that improves rather than worsens the intrusion upon state sover-
eignty."[95] Therefore, given the historical understanding, the Constitu-
tion's structure, and the Court's jurisprudence, the Court held that it is
unconstitutional for the federal government to compel the states into en-
forcing federal law.

## IV. ANALYSIS

The decision in *Printz* basically addresses the question of whether
executive-commandeering violates the principle of dual sovereignty,
which the Court answers affirmatively. Dual sovereignty is also impli-
cated in the application of the federal immunity statute. For several
years, the Court had held that the federal immunity statute could not bar
state prosecutions because it would violate the principle of dual, or sepa-
rate, sovereignty.[96] Therefore, if prohibiting state prosecutions is a form
of executive-commandeering, which it appears to be, then the effect of
*Printz* is to revive the view that the federal immunity statute cannot pre-
empt a state prosecution.

### A.  Executive-Commandeering and Dual Sovereignty

For all of its discussion about the historical understanding of execu-
tive-commandeering, the Constitution's structure, and the Court's juris-
prudence on the issue, the basic holding of *Printz* is that executive-
commandeering violates the dual sovereignty principle of federalism that
is embedded in the structure of the Constitution. For example, the Court

---

92. *See Printz*, 521 U.S. at 925–26. The Court stated that the statute in *Hodel v. Virginia Surface
Mining & Reclamation Ass'n*, 452 U.S. 264 (1981), did not commandeer the states because state com-
pliance was only an optional alternative to direct federal intervention. *See Printz*, 521 U.S. at 926 (cit-
ing *Hodel*, 452 U.S. at 288). The Court sustained the statute in *FERC v. Mississippi*, 456 U.S. 742
(1982), for the same reason. *See Printz*, 521 U.S. at 926 (citing *FERC*, 456 U.S. at 764–65). "We
warned that 'this Court never has sanctioned explicitly a federal command to the States to promulgate
and enforce laws and regulations . . . .'" *Printz*, 521 U.S. at 926 (quoting *FERC*, 456 U.S. at 761–62).

93. *See Printz*, 521 U.S. at 926 (citing New York v. United States, 505 U.S. 144 (1992)).

94. *See Printz*, 521 U.S. at 926–28.

95. *Id*. at 928.

96. *See supra* notes 31–39 and accompanying text.

stated, "It is an essential attribute of States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority."[97]   The Court later added, "It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."[98]   To arrive at this conclusion, the Court primarily and ultimately relied on the historical understanding of executive-commandeering, not on its discussion of the Constitution's structure and its own jurisprudence.[99]

The Court's analysis of whether executive-commandeering violates the structure of the Constitution was no more than a restatement of the principle that dual sovereignty is part of the Constitution's structure. This does not answer the question, though, of whether executive-commandeering is unconstitutional unless it is assumed that executive-commandeering violates the principle of dual sovereignty.   To reach this conclusion, the Court relied on its view of the historical understanding of executive-commandeering.[100]

Similarly, in analyzing its own jurisprudence on the issue of executive-commandeering, the Court was solely relying on the principle of dual sovereignty from its earlier cases.   In discussing its jurisprudence, the Court noted that the cases that touched on the issue denied that the federal government had the power to commandeer the states.[101]   However, all of the cases the Court cited stated that federal commandeering of states violated the principle of dual sovereignty.[102]   But those cases did not look to the historical understanding of the issue, rather they just declared that it violated the principle of dual sovereignty because it would augment federal power at the expense of state power.

Furthermore, as the Court was dismissive of the persuasiveness of recent federal statutes to show that executive-commandeering was constitutionally permissible,[103] it is unlikely that its own recent jurisprudence on the issue—which did not account for whether executive-commandeering was historically permissible—was persuasive either. Therefore, the decision is grounded almost exclusively on the Court's view that the historical evidence proves that executive-commandeering violates the principle of dual sovereignty.

In discussing the historical understanding of executive-commandeering, the Court points out that although the founders expected the states to help enforce federal law, the founders did not indicate that the states were compelled to do so.[104]   The Court's evidence on

97.   *Printz*, 521 U.S. at 928.
98.   *Id.* at 932.
99.   *Id.* at 904–35.
100.   *Id.* at 904–18.
101.   *See id*. at 925–29.
102.   *See id*. at 925–27.
103.   *See id*. at 918.
104.   *See id*. at 910–12.

this point is better supported by early federal statutes than on its exegesis of passages from the Federalist papers. These statutes seem to contemplate the view that the states would help enforce federal law, but contained provisions in them for situations when the states refused.[105]

The statutes seem to support the Court's views of the Federalist papers, but the Federalist papers, alone, seem ambiguous on the issue of whether the federal government could commandeer the states. The Court also seems to put much weight on the two statutes it cites that were enacted well after the founding period,[106] which also support the view that state participation was expected but not compelled.[107] Since participation was expected but never compelled, the Court concluded that participation could not be compelled because it would violate the principle of dual sovereignty.[108] The decision in *Printz*, then, is ultimately an exposition on the principle of dual sovereignty.

As Professor Jackson noted, "*Printz* [was] no bolt from the blue."[109] Rather, it is part of the reinvigoration of dual sovereignty as a check on federal power.[110] This reinvigoration adumbrates a return to the Court's previous holding that the application of the federal immunity statute to state prosecutions violates the principle of dual sovereignty.

## B.  The Federal Immunity Statute and Dual Sovereignty

Prior to the ruling in *Adams v. Maryland*,[111] the Court had grappled with the issue of whether the principle of dual sovereignty precluded the federal government from applying a federal immunity statute to state court proceedings.[112] Part of the holding in *Brown v. Walker*[113] indicated that if a witness in federal court was immunized under the statute, the witness could not be prosecuted in state court.[114] However, the argument of the dissent in *Brown* prevailed on the issue until *Adams*.[115]

In *Hale v. Henkel*,[116] the Court noted that the only consideration for a federal witness who has been immunized is that he cannot be prosecuted in federal court.[117] "The question has been fully considered in England, and the conclusion reached by the courts of that country that the

---

105.  *See id*. at 905–10.
106.  *See id*. at 916–17.
107.  *See id*.
108.  *See id*. at 933.
109.  *See* Jackson, *supra* note 61, at 2183.
110.  *See id*. at 2181.  "In *Printz v. United States*, a narrow majority of the Supreme Court continued the revival of constitutional federalism as a constraint on national power begun in *New York v. United States*." *Id.*
111.  347 U.S. 179 (1954).
112.  *See supra* notes 27–39 and accompanying text.
113.  161 U.S. 591 (1896).
114.  *See id*. at 606–08.
115.  *See supra* notes 27–46 and accompanying text.
116.  201 U.S. 43 (1906).
117.  *See id*. at 69.

878                UNIVERSITY OF ILLINOIS LAW REVIEW                [Vol. 2003

only danger to be considered is one arising within the same jurisdiction and under the same sovereignty."[118]  The same sovereignty argument reinforces the principle of dual federalism; that is, where the federal government is acting within its power, it is sovereign over the people, and when the states are acting within their power, they are sovereign over the people.  Neither sovereign can control the other.

    This point is made even more explicit in *United States v. Murdock*.[119]  In *Murdock*, the Court stated:

> This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute.[120]

Other Court holdings related to the immunity issue are also laced with the language of dual sovereignty.  In *Feldman v. United States*,[121] which upheld the conviction of a man whose immunized state testimony was used to convict him in federal court, the Court heavily relied on the dual sovereignty principle.[122]  "The distinctive operations of the two governments within their respective spheres is basic to our federal constitutional system, howsoever complicated and difficult the practical accommodations to it may be."[123]

    Even after the *Adams* Court held that a federal immunity statute bars state prosecution of the immunized witness, in *Knapp v. Schweitzer*,[124] the Court again reinforced the dual sovereignty principle.[125]  In *Knapp*, the defendant refused to testify in a state court proceeding despite a grant of immunity, for fear that his testimony would be used to prosecute him for a violation of federal law.[126]  The Court upheld his contempt conviction, stating that the ability to compel immunized testimony "cannot be denied on the claim that such state law of immunity may expose the potential witness to prosecution under federal law."[127]  The Court also noted that "[t]he essence of a constitutionally formulated federalism is the division of political and legal powers between two systems of governments . . . ."[128]

---

118.  *Id.*
119.  284 U.S. 141 (1931).
120.  *Id.* at 149.
121.  322 U.S. 487 (1944).
122.  *See id.* at 490–91.
123.  *Id.*
124.  357 U.S. 371 (1958).
125.  *See id.* at 375.
126.  *See id.* at 373.
127.  *Id.* at 379.
128.  *Id.* at 375.

No. 3]        FEDERAL IMMUNITY COMMANDEERING STATES           879

In *Adams*,[129] however, the Court made clear that, under its power to regulate interstate commerce, Congress could prevent the states from prosecuting a federally immunized witness.[130]  This was inconsistent with its previous rulings on the dual sovereignty principle, a principle the Court completely ignored.  And by ignoring the dual sovereignty principle, the Court failed to address two critical issues, concurrent criminal jurisdiction and individual rights, that had been inextricably bound up with the principle.

### 1.  *Concurrent Criminal Jurisdiction*

While today most federal crimes are also state crimes, this was not always the case.[131]  There were very few federal crimes during the period between the adoption of the Constitution and the Civil War, and these federal crimes were, for the most part, exclusive of state crimes.[132]  With the rise of a national economy in the late-nineteenth century, the federal government, as well as the states, began passing numerous regulatory crimes that covered much of the same conduct, a trend that continued through the New Deal era.[133]  From the 1960s through the mid-1990s, however, federal legislation has had a significant tendency to duplicate crimes that had traditionally been within the states' exclusive jurisdiction.[134]

This overlap in jurisdiction between the federal and state governments has lead to concurrent jurisdiction for most criminal conduct.  However, until *Adams*, the Court had interpreted dual sovereignty in cases of concurrent criminal jurisdiction to entail that each government was sovereign in prosecuting crimes against it.[135]  The federal government

---

129.   347 U.S. 179 (1954).

130.   *See id.* at 183.

131.   *See* Sara Sun Beale, *Too Many and Yet Too Few: New Principles to Define the Proper Limits for Federal Criminal Jurisdiction*, 46 HASTINGS L.J. 979, 980–81 (1995); Kathleen F. Brickey, *Criminal Mischief: The Federalization of American Criminal Law*, 46 HASTINGS L.J. 1135, 1137–39 (1995); James A. Strazzella, *The Federalization of Criminal Law*, 1998 A.B.A. CRIM. JUST. SEC. 5, 9 n.11 [hereinafter Task Force].  For a comprehensive bibliography of recent sources detailing the history and growth in federal criminal law, see Task Force, *supra* at 59–78.

132.   *See* Beale, *supra* note 131, at 981 n.11; Brickey, *supra* note 131, at 1137–39.

133.   *See* Brickey, *supra* note 131, at 1141–44; Task Force, *supra* note 131, at 6.  The most famous example of concurrent criminal jurisdiction was the explicit power given the states and federal government in the Eighteenth Amendment.  *See* U.S. CONST. amend. XVIII, § 2, *repealed by* U.S. CONST. amend. XXI.

134.   *See* Task Force, *supra* note 131, at 9 n.11.  There are currently more than 3,000 federal criminal laws.  *See id.*  The increasing duplication of state laws has led to much criticism among scholars and practitioners.  *See, e.g.*, Sanford H. Kadish, Comment, *The Folly of Overfederalization*, 46 HASTINGS L.J. 1247, 1248 (1995) ("But recent years have witnessed a considerable expansion of federal authority, particularly in the last decade, with the increasing effect of turning traditional state offenses into federal ones, raising some serious cause for concern.").  But the ability of the federal government to duplicate state criminal laws is somewhat limited.  *See* United States v. Lopez, 514 U.S. 549 (1995) (invalidating a federal law that prohibited possession of a firearm in a school zone because it was not within Congress's Commerce Clause power).

135.   *See supra* Part II.A–B.

could no more preempt a state prosecution by use of an immunity grant than a state prosecution could preempt a federal prosecution. Each was sovereign within its own sphere of powers, despite the fact that in many criminal cases their powers overlapped. This created problems, but as the Court noted in *Feldman v. United States*, those problems are a necessary corollary to dual sovereignty.[136]

The Court in *Adams* did not address the issue of dual sovereignty, which would have entailed an analysis of concurrent criminal jurisdiction. Instead, the Court sensed that there would be a problem for the federal government if a state could prosecute federally immunized witnesses, so the state prosecution was preempted.[137] In other words, the Court allowed Congress to control the sovereignty of the states. The result of *Adams* is that there is concurrent criminal jurisdiction unless the federal government says there is not, which is to say that there is dual sovereignty unless the federal government says there is not. This ability to preempt is a very peculiar form of dual sovereignty.

The federal immunity statute is quite different from statutes that explicitly preempt state regulation in the area of interstate commerce.[138] While federal criminal statutes generally are passed pursuant to Congress's interstate commerce power,[139] no serious argument can be made that in passing these laws, Congress also could preempt state criminal laws that traditionally have been the means of proscribing this type of criminal activity. If this were allowed, state sovereignty would become severely limited, as proscribing and prosecuting crimes is one of the main functions of state governments.[140] As the Court stated in *Knapp*:

> [The defendant's view] may well lead to the contention that when Congress enacts a statute carrying criminal sanctions it has as a practical matter withdrawn from the States their traditional power to investigate in aid of prosecuting conventional state crimes, some facts of which may be entangled in a federal offense. To recognize such a claim would disregard the historic distribution of power as between Nation and States in our federal system.[141]

Moreover, given the recent Supreme Court decisions in the area of federalism, in which the Court has curtailed the power of the federal gov-

---

136.   322 U.S. 487, 490–91 (1944).

137.   *See* Adams v. Maryland, 347 U.S. 179, 183 (1954).

138.   *See, e.g.*, Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a) (2000).

139.   *See* Brickey, *supra* note 131, at 1142.

140.   In fact, in 1998 almost ninety-five percent of the felony convictions in the United States were obtained at the state level; the other five percent were obtained at the federal level. *See* United States Department of Justice Bureau of Justice Statistics, *Courts and Sentencing Statistics*, *available at* http://www.ojp.usdoj.gov/bjs/stssent.htm (last visited Oct. 8, 2002).

141.   Knapp v. Schweitzer, 357 U.S. 371, 374–75 (1958); *see also* United States v. Lopez, 514 U.S. 549, 564 (1995) ("Under the theories that the Government presents . . . it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement . . . where States historically have been sovereign.").

ernment in relation to the states,[142] federal preemption of traditional state crime seems extremely implausible.

If the federal government cannot preempt state criminal law, why, then, should the federal government be able to prevent the states from prosecuting offenses that violate their laws when it immunizes a witness? The answer is that the federal government probably cannot under the dual sovereignty principle.

### 2. Individual Rights

The second problem the Court neglected to address in *Adams* by ignoring the dual sovereignty principle is that immunity grants implicate individual rights. For instance, the defendants in *Brown, Hale, Murdock, Feldman,* and *Knapp* all refused to testify despite immunity grants because they feared their testimony would lead to prosecution by the other sovereign.[143] Until *Murphy*, the Court eschewed this claim because under the dual sovereignty principle, the privilege against self-incrimination only could be invoked against the sovereign in which the witness was testifying.[144] In other words, the privilege or right was specific to the sovereign.[145] However, as the Court recognized in *Murphy*, the privilege against self-incrimination is an individual right that protects a witness or suspect from incriminating himself against either or both the federal and state governments.[146] In other words, the Court in *Murphy* severed the privilege against self-incrimination from its dual sovereignty moorings and held that the right stands on its own.[147] But in *Adams* the Court had not yet articulated this.

---

142. *See* Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001) (holding that states are immune from suit under the American with Disabilities Act because Congress exceeded its power under Section 5 of the Fourteenth Amendment); United States v. Morrison, 529 U.S. 598 (2000) (invalidating provision of the Violence Against Women Act that allowed victims of gender motivated crime to sue their attacker in federal court because it was not within Congress's Commerce Clause power); Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000) (holding that states were immune from suit under the Age Discrimination in Employment Act because Congress exceeded its power under Section 5 of the Fourteenth Amendment); City of Boerne v. Flores, 521 U.S. 507 (1997) (invalidating Religious Freedom Restoration Act because Congress exceeded its powers under Section 5 of the Fourteenth Amendment); Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996) (holding that Congress cannot rely on its Article I powers to abrogate states' sovereign immunity from suit); *Lopez*, 514 U.S. 549 (striking down a federal law that prohibited possession of a firearm in a school zone because it was not within Congress's Commerce Clause power).

143. *See supra* Parts II.A–B, IV.B.

144. *See supra* Part II.C.

145. This is still the case for the privilege against double jeopardy. That is, the individual right only prohibits a subsequent prosecution by the same sovereign. *See* Abbate v. United States, 359 U.S. 187 (1959).

146. *See* Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 79 (1964).

147. *See id. But see* United States v. Balsys, 524 U.S. 666 (1998). The privilege against self-incrimination only protects a suspect or witness in an American court from a prosecution in a domestic tribunal. *See id.* at 700. It cannot be invoked to protect against prosecution in a foreign tribunal. *See id.*

882            UNIVERSITY OF ILLINOIS LAW REVIEW          [Vol. 2003

The Court in *Adams* noted a conflict between federal and state law, and held that federal law was supreme.[148] But there was no conflict between federal and state law in *Adams*. The defendant's testimony implicated him in crimes against the federal government and the state of Maryland.[149] He was immunized against federal prosecution, but his testimony was used against him in a state prosecution.[150] This is just classic concurrent criminal jurisdiction under dual sovereignty. The Court had upheld the converse situation just a decade earlier in *Feldman*.[151] The only way there would have been a conflict in *Adams* is if Maryland had made it a crime to testify in front of Congress.

The conflict the Court must have had in mind is the problem a witness will face the next time Congress immunizes his testimony. That witness will be acutely aware that although he is free from federal prosecution, his statements will leave him wide open to a state prosecution. But that conflict is not between federal and state law. It is a conflict between the assertion of the individual right against self-incrimination and the principle that dual sovereignty permits concurrent jurisdiction: the right could only be asserted against one sovereign at a time, though both sovereigns could prosecute the defendant.

What is even more remarkable than the Court's decision in *Adams* is that just four years later in *Knapp v. Schweitzer*, the Court held that a witness immunized by the State could not refuse to testify for fear of federal prosecution.[152] The Court supported this conclusion based on the dual sovereignty principle,[153] even though it completely ignored the principle in *Adams*. So after *Adams* and *Knapp*, the principle of dual sovereignty with regard to the concurrent power to enforce criminal laws is that the states are subservient to the federal government in any area in which they exercise concurrent jurisdiction.

## C. *Preventive Commandeering and Dual Sovereignty*

The question after *Printz* is whether the *Adams* view of concurrent jurisdiction with regard to federal and state power to enforce criminal laws is still viable. More specifically, does the ability of the federal government to immunize witnesses in its proceedings preempt the states from prosecuting those witnesses for violations of state law?[154] Given the

---

148.  *See* Adams v. Maryland, 347 U.S. 179, 183 (1954).
149.  *See id.* at 179–80.
150.  *See id.*
151.  *See* Feldman v. United States, 322 U.S. 487 (1944).
152.  *See* Knapp v. Schweitzer, 357 U.S. 371 (1958).
153.  *See id.*
154.  Although federal immunity covers only the use and derivative use of testimony, *see* Kastigar v. United States, 406 U.S. 441 (1972), the assumption of this note is that if state prosecutors only learn of the criminal activity through immunized testimony, it is virtually certain that the person cannot be prosecuted. *See, e.g.,* State v. Tripp, 2000 WL 675492, at *17–18 (Md. Cir. Ct. 2000) (holding that

CLAIR.DOC                                                                8/29/2003 3:19 PM

Court's holding in *Printz* it is unlikely that the federal government can preempt state prosecutions.[155]  This type of federal power seems to violate the principle of dual sovereignty.

As the Court noted in *Printz*, the federal government and the state governments are each sovereign within their sphere of authority.[156]  This is the same principle that earlier rulings had used to support the position that neither the state nor the federal government was bound by each other's immunity agreements.[157]  Although the Court in *Printz* did not address the issue of concurrent jurisdiction, it is clear on the point that the federal government cannot compel the state governments to enforce federal law.[158]  That concept, the Court stated, is as anathema to the Constitution as the concept that the states could compel the federal government to enforce state laws.[159]

If this is the case, then there is arguably an equivalency to the related issue of whether the federal government can prevent the states from enforcing state law and whether the states can prevent the federal government from enforcing federal law.  To take the latter issue first, the Court has never held that the states can prevent the federal government from enforcing federal law.[160]  Once the federal government is acting within one of its enumerated powers, it is sovereign within its sphere of authority.  It would be clearly unconstitutional, then, for the states to prevent the federal government from enforcing federal law.  But if the state is acting within its "sphere of authority," why should the opposite not also be true?  The federal government cannot commandeer the states into enforcing federal law, even if the federal government thinks it is a very important law.[161]  But when it invokes the federal immunity statute, the federal government is telling the states that its enforcement of federal law is more important than the states' enforcement of state law in a given situation.

This is just another form of commandeering.  Instead of compelling the states to enforce federal law, the federal government is compelling them not to enforce state law.  But there is not much of a difference between the federal government ordering the states to do something they are not required to do and prohibiting them from doing something they are permitted to do.  The former is direct commandeering and the latter

Monica Lewinsky's pretrial testimony was influenced by the defendant's federally immunized testimony, and thus the State failed to meet the *Kastigar* burden).

155.   Congress may have power to preempt certain state prosecutions under section 5 of the Fourteenth Amendment.  However, since most federal criminal laws are passed under Congress's Article I powers, this note does not address that issue.

156.   *See* Printz v. United States, 521 U.S. 898, 920–21 (1997).

157.   *See supra* Part I.B.

158.   *See Printz*, 521 U.S. at 935.

159.   *See id.* at 920–21 (quoting THE FEDERALIST No. 39, 245 (James Madison)).

160.   *Cf.* Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 71 (1964) ("No one would suggest that state law could prevent a proper federal investigation . . . .").

161.   *See Printz*, 521 U.S. at 931–32.

UNIVERSITY OF ILLINOIS LAW REVIEW          [Vol. 2003

is preventive commandeering. Both forms violate the constitutional principle of dual sovereignty.

The Court's earlier rulings recognized this. After adopting a myriad of federal criminal laws, the federal government had concurrent jurisdiction with the states over much criminal conduct, but the principle of dual sovereignty still entailed that each government could fully enforce its own laws.[162] Thus, in areas of concurrent criminal jurisdiction the powers of the federal government and the powers of the state governments were mutually exclusive. Basically, the Court adapted the principle of dual sovereignty to concurrent jurisdiction. If each government had the power to proscribe certain conduct as criminal, then each could exercise that power equally. Therefore, the federal government could no more immunize a witness from state prosecution than a state government could immunize a witness from federal prosecution. This is the very essence of the form of dual sovereignty that the Court revitalized in *Printz*.

## V.  RECOMMENDATION

If the federal immunity statute cannot bind the states, then federal law enforcement will be frustrated. However, as was stated earlier, this frustration is the result of the exercise of an individual right; it is not the result of a conflict between state and federal law.[163] Witnesses given federal immunity who fear state prosecution can refuse to testify because the individual right to be free from compelled self-incrimination can be invoked against the State in a federal judicial proceeding.[164] To alleviate the converse problem—when a witness given state immunity refuses to testify in a state judicial proceeding for fear of federal prosecution—the Court in *Murphy*, invoking its supervisory powers over the federal courts, stated that it would honor state immunity grants in federal court.[165] Although Congress also could have adopted a similar rule,[166] the Court's holding was a practical solution that recognized and accommodated the states' interests in enforcing criminal laws.

In recognition of the federal interest in enforcing criminal laws, the states should honor federal immunity grants in state court. Since all states have statutes granting immunity from prosecution for compelled

---

162. *See supra* Part II.A–B.
163. *See supra* Part IV.B.
164. *See Murphy*, 378 U.S. at 79.
165. The Court's ruling did not entirely prohibit federal prosecution of state immunized witnesses. The Court stated that the federal government could not make direct or derivative use of the testimony in a federal prosecution. This holding led Congress to revise its immunity statute to change its grant of immunity from absolute immunity to use immunity. *See supra* notes 47–51 and accompanying text.
166. Congress, pursuant to its power to regulate the federal courts, could add a provision to the Federal Rules of Evidence that would exclude evidence obtained as the result of state immunized testimony.

No. 3]        FEDERAL IMMUNITY COMMANDEERING STATES        885

testimony,[167] the states should amend these statutes to specifically include a provision barring state prosecution of witnesses who testified under federal grants of immunity. Although the states are split on whether, under their own constitutions, immunity for compelled testimony must be transactional immunity or use and derivative use immunity,[168] this is not a major hurdle. The states that require transactional immunity can grant transactional immunity to a federally immunized witness even though the federal immunity statute provides only for use and derivative use immunity. The states that permit only use and derivative use immunity are in the same position as before.

By honoring federal immunity agreements, the states would be engaging in an exemplary form of cooperative federalism. Cooperative federalism generally refers to the system of governance where the state and federal governments work together in areas where they have concurrent jurisdiction.[169] But cooperative federalism also usually implies that, although states often share concurrent power with the federal government, the federal government has the right to exercise exclusive jurisdiction.[170] As Daniel J. Elazar wrote, "In other words, cooperative federalism introduces into a system of government—*which like all governments ultimately rests on its ability to resort to the exercise of coercive powers*—a marketplace dimension that serves to minimize the amount of coercion exercised and, through negotiation, to maximize the degree of consent."[171] But this form of cooperative federalism is inapplicable in areas, such as regulating crimes, where the federal government cannot exercise exclusive jurisdiction.

Another form of cooperative federalism, one that could be used by the federal government to get states to recognize federal grants of immunity, is the use of conditional grants.[172] Congress may place conditions on certain federal funds for state law enforcement that would require states to amend their immunity statutes to recognize federal immunity grants.[173]

167.  *See* LAFAVE ET AL., *supra* note 14, § 8.11.

168.  *See id.*

169.  *See, e.g.*, JOSEPH F. ZIMMERMAN, CONTEMPORARY AMERICAN FEDERALISM: THE GROWTH OF NATIONAL POWER 9 (1992) ("Cooperative federalism implies the existence of two planes of government which is the essential feature of dual federalism, but differs from it in terms of extensive interplane cooperation.").

170.  Zimmerman stated, "[t]he theory of cooperative federalism is helpful in promoting an understanding of the system, yet it fails to explain the structuring of national-state relations by the coercive use of formal preemption powers . . . ." *Id.*

171.  Daniel J. Elazar, *Cooperative Federalism*, *in* COMPETITION AMONG STATE AND LOCAL GOVERNMENTS: EFFICIENCY AND EQUITY IN AMERICAN FEDERALISM 65, 73–74 (Daphne A. Kenyon & John Kincaid eds., 1991) (emphasis added).

172.  *See* ZIMMERMAN, *supra* note 169, at 113–24.

173.  *See* South Dakota v. Dole, 483 U.S. 203, 206 (1987) ("Incident to this power [to tax and spend for the general welfare], Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'") (citations omitted); *see also* Printz v. United States, 521 U.S. 898, 935 (1997) (O'Connor, J., concurring) ("Congress is also free to amend the interim program [of the Brady Act] to provide for its continuance

However, this type of cooperative federalism is also unsatisfactory because it is not really cooperation at all.[174]  Cooperation is acting jointly upon the recognition that the states and the federal government both play an integral role in enforcing criminal laws and preventing crime.  It is not inducing through the power of the purse or leveraging through a superior bargaining position concessions that should be implemented for practical policy reasons.  Therefore, the best approach, in the spirit of true cooperative federalism, is for the states to amend their immunity statutes to prohibit the use of federally immunized testimony.

## VI. CONCLUSION

For a substantial period of time after the Supreme Court first upheld the constitutionality of federal immunity grants, federal immunity statutes could not bar subsequent state prosecutions.[175]  Although the federal and state governments often exercised concurrent jurisdiction over the increasing amount of conduct subject to criminal sanctions, the principle of dual sovereignty meant that neither of them could interfere with the other.[176]  During the Warren Court era, however, the Court changed its view, holding that a federal grant of immunity preempts a subsequent state prosecution.[177]  Given the decision in *Printz* that federal commandeering of state executive officials violates the principle of dual sovereignty,[178] this type of preemption appears once again to be unconstitutional.

Although federal immunity grants do not directly commandeer state executive officials into enforcing federal law, the effect is identical.  Requiring state officials to enforce federal law or prohibiting state officials from enforcing state law is commandeering.  The first form is direct commandeering; the second is preventive commandeering.  Both are unconstitutional because they violate the principle of dual sovereignty.  However, given the integral role of the states and federal government in preventing and enforcing crime, the states should cooperate with federal law enforcement initiatives by amending their immunity statutes to prohibit the use of federally immunized testimony.  This would be an exemplary form of cooperative federalism by the states, acknowledging that even though they cannot be required to enforce federal law, they are—as the founders believed-expected to do so.

on a contractual basis with the States if it wishes, as it does with a number of other federal programs.").

174.  Also, the federal government already provides substantial funding to the states for law enforcement purposes.  *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.  As a matter of appreciation, the states could at least enact, without prompting, laws that recognize federal immunity grants.

175.  *See supra* Part II.B.

176.  *See id.*

177.  *See supra* Part II.C.

178.  *See supra* Part III.